# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

United States of America,

        Plaintiff,

vs.

Aaron Abel Lizarraga,

        Defendant.

CR 14-00886-TUC-RM (LAB)

**REPORT AND RECOMMENDATION**

This matter was referred to the Magistrate Judge to address the Government's Petition for Warrant filed on February 6, 2019, by which the Government requests that the Court revoke Defendant Lizarraga's Supervised Release. (Doc. 276). The Petition alleges that the defendant violated two conditions of his Supervised Release: he failed to report to his Probation Officer as instructed; and he possessed a firearm. *Id*. The petition states that the defendant began his supervised release on 9/1/17 and the supervision was scheduled to terminate on 8/31/20.

1

An evidentiary hearing was conducted on May 8, 2019 (RT) and May 10, 2019 (RT1)[1].    United States Probation Officers (USPO) Olivia Bartfalvi and Deborah Valenzuela testified for the government.  The defendant was present and represented by counsel.  He testified in his own defense, along with defense witnesses Pablo Valencia and Fidencio Martinez-Abelaiz.  Government's exhibits 1 through 3 were admitted by stipulation of the parties.

Mr. Lizarraga admitted during the hearing that he failed to report to the probation officer as directed as required by standard condition 2 and as set forth in Allegation 1 of the petition. The Court finds he violated standard condition 2.  Based on the evidence presented at the evidentiary hearing the Court finds by a preponderance of the evidence that the defendant possessed a firearm, in violation of standard condition 10, as alleged in Allegation B of the petition to revoke.[2]

## I.  Facts

**Exhibit 1** is the judgment indicating that the defendant was sentenced on 1/29/15 to serve 50 months in the bureau of prisons with three years of supervised release to follow.  (Doc. 205) The defendant pled guilty to Conspiracy to Possess with Intent to Distribute Marijuana. A number of conditions of supervised release

---

[1] RT is reporter's transcript from 5/8/19. RT1 is reporter's transcript from 5/10/19.

[2] The Court also finds that the defendant violated mandatory condition 1, that he not commit a state or local crime, when by his own admission he drove on a suspended driver's license.  Mr. Lizarraga testified that he ingested and was under the influence of prescription medication that was not prescribed to him, in violation of condition 9. Neither of these violations were alleged in the petition.

were imposed, including standard conditions #2 and #10.  Those conditions required, respectively, that the defendant report to the probation officer as directed and not possess a firearm.

**Exhibit 2** is a copy of Exhibit 1 but it was signed by the defendant and the USPO on 9/11/17.

**Exhibit 3** is a copy of the defendant's conditions of supervised release signed on 9/11/17 by USPO Bartfalvi and the defendant.

**USPO Olivia Bartfalvi** testified that she has been a federal probation officer in Tucson for four years. (RT 8:19-20) On 9/1/17, she was assigned to supervise Defendant Lizarraga. (RT 10:14-15, 22) She met with him on 9/11/17 to review the judgment and the conditions of supervision. (RT 11:2-5) The meeting lasted about two hours. (RT 13:1-3) USPO Bartfalvi explained the conditions to the defendant. (RT 11:22-24) He had no questions. (RT 12:24-25) Mr. Lizarraga had a positive attitude, was employed and had good family relations. (RT 14:7-11) All his drug tests were negative. (RT 60:15-19) There were five uneventful home visits. (RT 60-61:24-25, 1-2)

Mr. Lizarraga was compliant with his conditions until April 2018 when the USPO lost contact with the defendant. (RT 14:17-19, 23) She was concerned. (RT 15:1-2) On 10/26/18 Mr. Lizarraga reported to the probation office for a one-hour appointment with USPO Bartfalvi. (RT 15:18-21, 25) He was reminded that he was required to report monthly as directed on the online web-based program. (RT 16:8-

12) Mr. Lizarraga failed to report in November and December of 2018, and in January 2019. (RT 17:16-17)

After trying unsuccessfully to reach the defendant by phone (RT 17:21-22), USPO Bartfalvi and her partner, USPO Deborah Valenzuela, went to his home on 1/31/19 to find him. (RT 21:3-4; 22:9-11) Officer Bartfalvi made contact with the defendant's sister and was told that the defendant was not home. (RT 21:15-18) Officer Bartfalvi left her business card and asked the sister to have the defendant contact her. (RT 22:1-3) As the officers were leaving, they saw the defendant drive up and park. (RT 23:14-18) The officers turned around and pulled their vehicle up alongside the defendant's truck. (RT 24:5, 16-17) He was out of the truck by then. (RT 24:17-18)

USPO Bartfalvi spoke to the defendant through the open window of her vehicle. (RT 25:13-15) Mr. Lizarraga explained that he had changed his phone number and did not have the officer's phone number. (RT 25:20-21) He reached into the driver's side truck window to retrieve his cell phone so he could provide his new phone number to Officer Bartfalvi. (RT 26:3-5, 12-13, 18-21) Her vehicle was parallel to his vehicle. (RT 66:11-14)

When the defendant reached into the truck Officer Bartfalvi saw him pick up a gun from the center console and place it on the driver's seat. (RT 27:7-12) The defendant used his right hand to pick up the black handgun, which the USPO saw "fairly" clearly. (RT 28:8, 11-12, 16) She was extremely close to Mr. Lizarraga when

he reached into the truck. (RT 65:4-6) His back was to her. (RT 65:7-9) The officer was still seated in her vehicle when she saw the gun. (RT 65:11-15)

The gun was not a revolver but she only saw it for a second or two so Officer Bartfalvi cannot say what kind of gun it was. (RT 62:8, 12-13, 22-24) At that time she was watching the people outside the house, the defendant, traffic and her partner. (RT 67:2-7)

Upon seeing the gun, Officer Bartfalvi thought she and her partner were in danger. (RT 28:18-19) She commanded the defendant to put his hands up and back away from the vehicle. (RT 28:24-25) He complied. (RT 29:21-22)  Officers Bartfalvi and Valenzuela exited their vehicle. (RT 30:1) They commanded the defendant to sit on the curb but he refused to comply. (RT 30:3-4) He was pacing, upset and acting erratic. (RT 30:10-11) Mr. Lizarraga was moving toward the vehicle, refusing to stay still and insisting that he wanted to leave in the truck. (RT 34:21-23)

Mr. Lizarraga said he knew that he was in violation but he argued that he had been compliant thus far. (RT 35:15-17) He became very upset when Officer Bartfalvi tried to call her supervisor. (RT 35:18-19) She put the phone away but the defendant still refused to sit and calm down. (RT 35:22-24) He asked her to listen to him and said even though he knew he was in violation, he didn't want to go down this way. (RT 43:15-17)

The defendant said he didn't want to stay and he was going to leave in the truck. (RT 45:14-15) The officer told him that he could leave but not in the truck

5

because of the presence of the gun. (RT 45:16-18) Mr. Lizarraga refused to walk away and was firm in his resolve to leave in the truck.  Officer Bartfalvi told the defendant that he could not get in the truck because of the firearm and the officers' concern for their safety. (RT 45:14-21; 74:21-24).   He said he knew he was in violation for possessing the firearm. (RT 44:9-10) Even when the USPO mentioned the firearm, Mr. Lizarraga did not deny it. (RT 75:5-8)

There were multiple people and cars present. (RT 36:9-10) A man drove up, got out of his car and approached the officers.  He said the firearm was his. (RT 36:10-12) The officers did not know if he was armed. (RT 38:13-14) He tried to enter the truck but the officer told him to back away and stay out of the truck for safety reasons. (RT 36:13-16) The man complied. (RT 42:21-23) The USPO was trying to keep an eye on the defendant, the truck and all the people and activity in the area. (RT 36:18-20) She did not know who the other people were or if any of them were armed. (RT 40:21-23)

The USPO eventually agreed to allow the defendant to leave in the truck on the condition that the officers could leave the area first. (RT 47:5-8) Officer Bartfalvi did not try to take possession of the firearm because the defendant was upset, other people were nearby, and it wasn't worth the risk of escalating the situation. (RT 47:16-19) The confrontation lasted about 5 minutes or less. (RT 50:3-7; 57:19-21) Officer Bartfalvi did not draw her service weapon because she did not want a gun fight. (RT 47:20-25) She did not use her phone to record or photograph the exchange because she didn't want to be distracted and wanted her hands free. (RT 73-74:23-25,

6

1-5) She took a photo of the defendant's license plate as the officers left the scene. (RT 51:4-6) When Mr. Lizarraga saw that, he asked if the officer really wanted to turn this into a high-speed chase. (RT 51:6-8)

As the officers were leaving Officer Bartfalvi looked in the rearview mirror and saw the defendant get into the truck and leave. (RT 69:2-6) When the officers got to a safe place, Officer Bartfalvi called her supervisor and 911 from about a block away to report a felon in possession of a firearm and provide a description of the vehicle due to safety concerns. (RT 52:2-3, 9-13) Tucson Police Department did not respond. (RT 55:14-15) ATF did not respond to the area. (RT 56:4-8) The officers left and continued to see other defendants whom they were scheduled to visit. (RT 56:9-11) Officer Bartfalvi later sought an arrest warrant. (RT 56:22-24)

Mr. Lizarraga called Officer Bartfalvi later in the day and apologized. (RT 76:9-11; 77:1) He was speaking so quickly the officer could hardly understand him. (RT 76:17-19) She asked the defendant to slow down. He said he would call back and he hung up. (RT 76:17-22)   Mr. Lizarraga never called back. (Id.)

On rebuttal Officer Bartfalvi testified that the gun was on top of the console, which was parallel to the driver's side window, but she is not sure if it was lower, higher or equal to the window. (RT1 61:18-22; RT1 62:1-3)

**Pablo Valencia** is Mr. Lizarraga's brother-in-law and has been married to his sister Myra for 12 to 13 years. (RT 80:13-15) He is a construction worker. (RT 80:16-17) Mr. Valencia was present on 1/31/18 for a few hours at the family home

where Mr. Lizarraga resides. (RT 80:19-24) He was doing laundry at the house. (RT 81:5-6)

Mr. Valencia was outside when the USPOs came to the house looking for the defendant. (RT 82:4-5) Just after the officers left, the defendant returned home from driving Mr. Valencia's truck around the block to test the brakes. (RT 82-83:16-25, 1-7) He doesn't know where the defendant went or what was in the truck during the 20 minutes Mr. Lizarraga was gone. (RT 102:22-23; 103:7-9)

When he returned, the defendant got out of the half ton GMC pick-up truck. (RT 84:1-2, 4, 8) The USPOs parked their SUV next to the truck. (RT 84:13-16) Mr. Valencia and Mr. Lizarraga walked back toward the truck. (RT 85:21) They were between the truck and the USPOs' vehicle. (RT 86:1-3) Mr. Valencia thinks the USPO was out of her vehicle. (RT 85:17-19) Mr. Valencia had two trucks at the house. He did not see another vehicle at the scene or anyone else walk up. (RT 88:19-22)

The officer told Mr. Lizarraga she needed a way to contact him. (RT 99:3-6) Mr. Lizarraga said he needed to retrieve his cell phone to get his phone number. (RT 99:17-19) He reached into the truck window and grabbed his phone. (RT 86:10-12; 87:13-26) Mr. Valencia saw the defendant pick up the phone but he didn't hold it up or say it was just a phone. (RT 100:17-21; 103:18-19, 21) Mr. Valencia did not see a gun and there was no gun in the truck. (RT 86:24-25; 87:3-4) He was right beside Mr. Lizarraga when he reached through the truck window. (RT 113:6-9) The USPO

was farther away from Mr. Lizarraga than Mr. Valencia was. (RT 113:23-24) When Mr. Lizarraga reached into the truck the USPO was out of her vehicle. (RT 115:5-8)

When Mr. Valencia heard the USPO say something about Mr. Lizarraga having a gun, he told the USPOs that anything in the truck was his. (RT 89:9-12) He never said anything about a gun. (RT 89:15-17) He never heard Mr. Lizarraga admit he possessed a gun. (RT 90:9-11) He did not hear the USPO tell the defendant to sit on the curb. (RT 109:22-25) Mr. Valencia wasn't really paying attention. He just wanted to get his truck. (RT 110:8-9) Everything happened fast. (RT 88:8) There were no threats or aggression. (RT 88:9-13)

Mr. Valencia believed that Mr. Lizarraga was scared because he hadn't been reporting to his USPO.  (RT 89:24-25) After the USPOs left, the defendant left and went to the park. (RT 90:12-15,19) Mr. Valencia and Mr. Martinez went to pick Mr. Lizarraga up at the park about 20 minutes later. (RT 90-91:21-25, 1-3) He did not see a gun in the truck. (RT 91:14-15) Mr. Valencia heard Mr. Lizarraga call the USPO from the park but she did not answer the call. (RT 109:6, 12) The defendant did not return to the house that day. (RT 106:13-15)

**Fidencio Martinez-Abelaiz** is Mr. Lizarraga's younger brother. (RT 116:25) He lives with the defendant and other family members and was at the house when the USPOs arrived on 1/31/19. (RT 117:6-8) Mr. Martinez was outside, walking toward the front of the house. He saw the probation officer inside her car and Mr. Lizarraga outside of the car. (RT 118:8-11) Pablo Valencia was standing in front of his GMC truck. (RT 118-119:19-24, 1-3) He was briefly in between the trucks and was around

9

the trucks the whole time. (RT 126:20-22) The truck was parked by the curb and the officers' truck was next to it. (RT 119:5-6) The USPO was seated in the truck the entire time while she spoke with the defendant. (RT 128:7-9, 12-14)

Mr. Martinez saw Mr. Lizarraga reach into the truck and heard him say he was getting his phone. (RT 120:6, 9-10) He did not see Mr. Lizarraga pick up anything, including a gun. (RT 120: 13-17) Mr. Martinez was about 10 feet away from the defendant and the officer while their conversation took place.  (RT 121:17-22) He never heard any discussion about a gun (RT 121:16), but he heard the USPO say the word "gun" (RT 130:13-15; 131:6-7). The defendant responded by asking what she was talking about and explaining that he was getting the phone so he could provide the phone number she asked for. (RT 131:12-13, 14-15, 23-25) Mr. Martinez moved toward the gate but never went into the street. (RT 124-125:24-25, 1) He could not hear "verbatim" what was being said. (RT 125:11-13)

When the exchange was taking place between the defendant and the USPO, Mr. Valencia was right by the vehicles and said that anything in the truck was his. (RT 132:6-12) The entire event occurred over about two or three minutes. (RT 120:21-25)

After the confrontation with the USPOs, Mr. Lizarraga left in the truck. About 20 minutes later, Mr. Martinez went with Mr. Valencia to pick up the truck from Mr. Lizarraga at a nearby park. (RT 121-122:25, 1-7) Mr. Martinez never saw a gun in the truck and never saw the defendant with a gun. (RT 122:12-16) The defendant did not come home that night. (RT 133:8-9)

10

**Aaron Lizarraga** testified that he was convicted of a marijuana offense. (RT 137:24-25) After serving 22 months in prison and six months in the halfway house, he was released on home confinement to his mother's house, where the incident in this case took place. (RT 138:1-10) Mr. Lizarraga admitted that he met with his probation officer and was told that he had to report monthly (RT 141:4-6), but he failed to report in November and December 2018 and January 2019. He knew that was a violation but the USPO was lenient with him so he "didn't pay much attention". (RT 141:20-22)

About three weeks before 1/31/19, Mr. Lizarraga was taking a tire off a car when the jack gave out. The car hit his arm, requiring him to go to the hospital for stitches. (RT 142:7-9, 13-17) Mr. Lizarraga declined pain medication because he was previously addicted to pain meds, but eventually he took medication from anyone who would give it to him. (RT 143:9-12, 20-22) He took medication on 1/31/19 and the day before. (RT 144:1-4) He took whatever he could get. (RT 144:6-8) The pain medication may have affected his perspective or understanding that day, mixed with adrenaline and confusion. (RT1 21:13-16)

At the time the USPO arrived at his house, Mr. Lizarraga was testing the new brakes he put on his brother-in-law's truck. (RT 145:1-6) The officer told Mr. Lizarraga that he was driving very fast and almost hit her. (RT 145:6-7) He was driving Mr. Valencia's half-ton 1985 GMC Sierra truck. (RT 146:3-8) He was gone with the truck for about 10 or 15 minutes to test drive it and go to the store to get something to drink. (RT 146:14-16) Mr. Lizarraga was driving erratically, stopping

11

short at the stop sign and then flooring it more than he needed to test the brakes because he loves trucks and he felt the power. (RT 146-147:17-25, 1-3)

When Mr. Lizarraga returned to the house he did not realize that the USPOs were there. (RT 147:9-14) He got out of the truck and walked towards the house. (RT 147: 14-17) When he turned around he saw the probation vehicle parked next to the truck. (RT 147:20-22) Mr. Lizarraga walked up to the officers. (RT 148:10-11) Officer Bartfalvi said she needed to speak with him and asked what was wrong with his phone number. (RT 148:13-14) He explained that he had a new phone number which he failed to report to her. (RT 148:14-15) He told the officer that he needed to retrieve his phone from the truck because he didn't know the new number. (RT 148:15-17)

Both USPOs were still in their vehicle. (RT 149:5-7) Mr. Lizarraga had to stand on his tip toes to reach into the truck. He reached for the center console and grabbed his phone. (RT 149:8-10, 14) The truck is higher than the USPO's SUV. (RT 149:16-19) The center console that he retrieved his phone from is lower than the bottom of the window because it's an armrest. (RT1 22:8-20) He heard the officer say something and she asked him to step away from the truck. (RT 150:11-13) He picked up his phone, not a gun. There was no gun in the truck. (RT 150:14-20)

Mr. Lizarraga told the officer that he f'd up because he was driving on a suspended license, taking pills that would result in a positive drug test and hadn't been reporting. (RT 151:2-4, 8-10) However, he never said he had a gun and the officer did not ask him about a gun. (RT 151:11-12) She kept telling him to calm

12

down. He asked her to put her phone down so he could talk to her and because he didn't want her to call the police. (RT 151:16-18) Mr. Lizarraga had the phone in his hand while they were talking and then he put it in his pocket. (RT 151-152:24-25, 1-2) The phone was a big black phone from Metro. (RT1 24:15-18) The officer told him to sit on the curb but he did not. (RT 182:15-18, 22-24) He told her that he wasn't going back to prison now and would turn himself in later. (RT 155:5-6) His son's birthday was four days later and he didn't want to miss it. (RT 158:11-15)

The USPOs left. (RT 155:7-8) Mr. Lizarraga left because the officer had her phone in her hand and he thought she was calling the police. (RT 155:9-13) When the officer took a photo he thought she was reporting him so he asked her if she really wanted a high speed chase because if the police chased him he could hurt someone or himself. (RT 155:15-18) He left in his brother-in-law's truck. (RT 156:12-14) He never went home that day. (RT1 10:17-18) There was never a gun in the truck. Mr. Lizarraga did not hide a gun or dispose of a gun. (RT 156:16-20)

Mr. Lizarraga called the officer later that day from the park and apologized for how he acted. (RT 156-157:24-25, 1, 13; RT1 11:13-15) The officer asked Mr. Lizarraga if the gun in the truck was his, since he was being so honest. (RT 157:19-22) He responded by asking her "What gun?", "There was no firearm." (RT 157:23-25) The questions caused Mr. Lizarraga to panic so he hung up. (RT 157-158:25, 1) He called her back but she didn't answer so he texted her to say he would call the next day. (RT 158:1-4) Mr. Lizarraga planned to turn himself in but instead he was arrested a month and a half later. (RT 158:7-8)

**Deborah Valenzuela** has been a USPO for 15 years. (RT1 28:7-9) On 1/31/19 she was working with USPO Olivia Bartfalvi. (RT1 32:22-25) She has patrolled with Officer Bartfalvi about once a week over the past three to four years. (RT1 52:22-23) She did not write a report and did not read her partner's report. (RT1 42:20-24) However, this was an important incident because she has never heard her partner say "gun" before. (RT1 51-52:24-25, 1) Officer Valenzuela did not record the incident due to officer safety. She had her hand near her service weapon in case she needed to draw; she wanted her hands free. (RT1 53:17-21)

Officer Valenzuela did not draw her weapon because there were at least two men, two women and a child in the driveway. (RT1 55:3-12) She did not know if any of them were armed. (RT1 55:15-16)

The officer does not remember if they were in a truck or an SUV. (RT1 33:12-13; 34:20-22) Their truck and the defendant's truck were both high and almost even with each other. (RT1 33:14-24) She could clearly see into the defendant's truck. (RT1 34, 1-2) Officer Valenzuela saw the defendant reach into his truck for a cell phone but she did not see him take anything out. (RT1 35:5-6, 13-15) After he reached into the truck she believes he had a cell phone in his hand. (RT1 35:16-18) She never saw Mr. Lizarraga put anything in his pocket. (RT1 40:12-13)

Both officers were still in their vehicle when Mr. Lizarraga reached into the truck. (RT1 46:6-8) His back was to the officers. (RT1 46:11-13) She could not see his hand as he reached into the truck. (RT1 46:6-8, 20-22) Mr. Lizarraga reached into

the truck for one or two seconds. (RT1 48:6-12) Officer Bartfalvi had a better view than she did. (RT1 52-53:25, 1)

Officer Valenzuela could not see if the defendant reached in and picked anything up off the console. (RT1 46-47:23-25, 1) If he had anything in his hand it was a cell phone and not a gun. (RT1 49:19-23) Officer Valenzuela never saw a gun that day. (RT1 47:8-9) Officer Valenzuela's partner told her she saw Mr. Lizarraga move a gun from the center console to the seat. (RT1 36:2-3) She never saw a firearm. (RT1 36:8-10) When she heard there was a firearm both USPOs exited their vehicle and commanded Mr. Lizarraga to step away from the vehicle. (RT1 36:11-14) He complied by moving to the sidewalk. (RT1 36:17-20) There were other people in the area but no one else was near the truck. (RT1 36:21-24)

Officer Valenzuela heard her partner mention a firearm. (RT1 37-38:25, 1-2) She also heard Mr. Lizarraga say that he knew he f'd up, that the gun was his and that he knew the USPO saw the gun. (RT1 38:6-7) The officer heard very clearly that he said the gun was his several times. (RT1 38:11-13)

The defendant said he wanted to leave. (RT1 40-22-24) They asked him to walk away but he did not. (RT1 41:1-3) He responded by telling the officers that he was not leaving, was going to get into the truck and was not going to get arrested. (RT 41:14-17) He said he knew he had the gun and that the officers were going to call the police. He was not going to walk away and was going to get in the truck and leave. (RT1 41:17-19)

15

Another person came from the driveway area, walked past Mr. Lizarraga to another SUV and reached into the passenger's side. (RT1 38:17-25) Officer Valenzuela asked him to take his hand out of the vehicle and back up to the driveway, which he did. (RT1 38-39:25, 1-4) This man said that the gun in the truck was his. (RT1 39:12-19)

The USPOs decided to let the defendant leave, for officer safety. (RT1 41:20-22) They left first. (RT1 41:24-25) They sped away. (RT1 42:2-3) They called 911. (RT1 42:6-7) Officer Valenzuela did not see if the defendant stayed or left. (RT1 42:8-9) The entire incident took about six or seven minutes. (RT1 48:5) The USPOs continued on with their duties that day as planned. (RT1 45:9-11)

**II.     Discussion**

According to 18 U.S.C. § 3583(e)(3), a district court may revoke a defendant's supervised release if it finds by a preponderance of the evidence that the defendant violated a condition of his supervised release. While the preponderance of the evidence standard is lower than the "beyond a reasonable doubt" standard, there still must be credible evidence that the defendant violated his conditions of supervised release. *U.S. v. Perez*, 526 F.3d 543 (9th Cir. 2008) The government must present evidence that makes it more probable than not that the defendant violated the terms of his supervised release.

Title 18 U.S.C. § 3583(g)(2), mandates revocation if a defendant possesses a firearm in violation of Federal law or a condition of supervised release. In the instant

16

case, the firearm possession was in violation of both federal law, since the defendant is a prohibited possessor, and supervised release conditions.

**Allegation A** - With respect to Standard Condition #2, Allegation A of the Petition charges that "Lizarraga failed to provide a written monthly report as directed for the months of November 2018, December 2018, and January 2019."  Based on the testimony of the Probation Officer, and the testimony and admissions of the defendant, the Court finds by a preponderance of the evidence that Defendant Lizarraga violated Standard Condition #2 as charged in allegation A of the Petition.

**Allegation** B - With respect to Standard Condition #10, Allegation B of the Petition charges that "On or about January 21, 2019, Lizarraga was observed and admitted to being in possession of a firearm."  Based on the testimony of the Probation Officers, with some corroboration by Pablo Valencia and Fidencio Martinez-Avilaez, the Court finds by a preponderance of the evidence that Defendant Lizarraga violated Standard Condition #10 as charged in allegation B of the Petition.

If the government relied exclusively on the testimony of USPO Olivia Bartfalvi that she saw the defendant reach into a truck and move a gun from the center console to the driver's side seat, the government may have fallen short of proving the violation by a preponderance of the evidence.  Officer Bartfalvi was the only person who testified that she saw a gun. She was seated in her vehicle with the defendant standing between her and the truck that allegedly contained a gun.  The defendant's back was to the officer. She testified that she saw the gun for one to two seconds and never again. There was testimony that the defendant's truck may have

17

been higher than the USPOs' vehicle, or at best the same height. The center console was lower than the bottom of the window.

Based on the testimony, it would have been nearly impossible for a person in Officer Bartfalvi's position to see and positively identify an object as a gun. The defense argued that there have been instances where law enforcement believed a person had a gun but it turned out he actually had a cell phone. Officer Valenzuela and the defendant testified that Mr. Liazrraga had a cell phone in his hand. Although that does not preclude the possibility that he moved a gun in the truck. And, the testimony from all the witnesses suggests that Mr. Lizarraga did have a gun in the truck that day.

By his own admission Mr. Lizarraga was under the influence of pain pills that were not prescribed to him. He admitted that the drugs and adrenaline caused him to be confused and may have interfered with his understanding. He was uncooperative with the USPOs. His reaction to their visit and their instructions was not commensurate with his explanation that he was worried because he was in violation for not reporting, driving on a suspended license and concerned about testing positive for drugs.

There was no evidence that the USPOs were aware of the suspended license. There was no evidence they intended to drug test Mr. Lizarraga at his home. This was not the first time Mr. Lizarraga had failed to report as instructed. He testified that he had failed to report previously and Officer Bartfalvi was lenient with him and hadn't filed a petition to revoke him.

Mr. Lizarraga's credibility and recollection were questionable. Although he was honest about some of his violations, he admitted that on the day in question his judgment was affected by the unprescribed pain medication he had taken over two days. He admitted that when he arrived on the scene he was driving erratically. He admitted that he threatened to lead law enforcement on a high-speed chase, although he knew that could cause injury to himself and others. He insisted he planned to turn himself in after his son's birthday but never did and was arrested on the warrant over a month later.

All the witnesses, with the exception of Mr. Lizarraga, testified that at some point they heard Officer Bartfalvi speak about a gun. When Mr. Valencia heard the USPO say something about a gun he told her that everything in the truck was his, apparently in an effort to absolve Mr. Lizarraga of any responsibility for a gun that may have been in his truck.  When Mr. Martinez-Abelaiz heard the USPO mention a gun he heard the defendant respond by asking what she was talking about and explaining that he was just reaching for his phone. Both USPOs testified that Mr. Lizarraga admitted he had a gun.

The preponderance of the evidence is that Mr. Lizarraga had a gun on 1/31/19 when the USPOs went to his home to make contact with him.

**III.    Recommendation**

Having considered the pleadings, testimony, and the arguments of counsel, the Magistrate Judge recommends that the District Court find that the defendant violated Standard Conditions #2 and #10.

Pursuant to 28 U.S.C. § 636(b), any party may serve and file written objections with the District Court within fourteen (14) days of being served with a copy of this Report and Recommendation. If the objections are not timely filed they may be deemed waived.

Dated this 6th day of June, 2019.

_Leslie A. Bowman_

Honorable Leslie A. Bowman
United States Magistrate Judge